# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**LABELLE MASON ASSOCIATES**                                  **CIVIL ACTION**

**VERSUS**

**THE HARTFORD STEAM BOILER**                          **NO. 06-732-C-M2**
**INSPECTION & INSURANCE COMPANY**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, January 31, 2008.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LABELLE MASON ASSOCIATES                                    CIVIL ACTION

VERSUS

THE HARTFORD STEAM BOILER                          NO. 06-732-C-M2
INSPECTION & INSURANCE COMPANY

## REPORT & RECOMMENDATION

This matter is before the Court on the Motion for Summary Judgment (R. Doc. 31) filed by defendant, the Hartford Steam Boiler Inspection & Insurance Company ("HSB"). Plaintiff, LaBelle Mason Associates ("LaBelle"), has not filed an opposition to this motion.

## FACTS & PROCEDURAL BACKGROUND

On or about August 29, 2006, LaBelle initiated this suit in the 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana. In its petition for damages, LaBelle alleges that it is the operator of a certain set of apartments located in Kenner, Louisiana, and that, as a result of Hurricane Katrina on or about August 28, 2005, those apartments sustained damage to their boiler and air conditioning unit, including a Trane-manufactured 300 ton screw compressor based chiller ("chiller") and its components. LaBelle further contends that, at the time of the loss, the air conditioning unit was insured for equipment breakdown and property damage through a policy with HSB. LaBelle asserts that, during the hurricane, the air conditioning system "took several power surges, shut down three (3) times and lost its mega ohms integrity causing the mega ohms to fall below the manufacture[r]'s operability reading of 200 mega ohms per each leg/connection point, thus,

1

causing insulation failure and so beg[an] the shorting out process to ground." *See*, LaBelle's petition, Exhibit A to HSB's motion.

LaBelle submitted a Notice of Loss under its policy with HSB on October 6, 2005, describing its loss as follows:  "Insured reports that A/C units not operating as a result of Hurricane Katrina."  *See*, LaBelle's Property Loss Notice, Exhibit Q to HSB's motion. On October 10, 2005, Ameritech A/C and Heating, Inc. ("Ameritech"), the company that regularly inspected and performed maintenance on the chiller at issue, inspected the chiller unit, found that it would not start after several attempts, and concluded that, among other things, the mega ohms "were bad."[1]  *See*, Ameritech Invoice, Exhibit K to HSB's motion. Subsequently, Ameritech told HSB that two of its meg readings were 20 megohms, and it called the manufacturer of the chiller, Trane, to verify its meg readings.  *See*, Exhibits N and O.

On October 19, 2005, an HSB inspector, Nolan Barrios ("Barrios"), went to LaBelle's apartment complex, met with Roger Pequeno (the owner of Ameritech) and LaBelle's representatives, and conducted an inspection of the chiller.  Barrios noted in his report that the chiller was equipped with a computer log system that "did not say the motor had a short in the motor winding.  It did record the power outages, not power spikes."  *See*, HSB's Investigation Report, Exhibit C to HSB's motion.  Barrios recommended that "an independent repair company should be called to verify the findings of the service company [Ameritech]."  *Id.*

---

[1] For reference, a "mega ohm" (also referred to herein as a "megohm" or "m-ohm") measures the winding resistance in a motor or the ability of the motor winding to carry electrical flow.  *See*, Deposition of John Bevington, p. 27.

On October 20, 2005, a Trane service tech, Joseph Wessing ("Wessing"), went to LaBelle's premises, at Ameritech's request, to verify Ameritech's meg readings and again found the readings to be "below specs."[2]  Ameritech therefore issued a proposal to LaBelle on October 21, 2005 for replacement of the chiller, noting that "it appear[ed] that [LaBelle's] Trane Chiller took a couple of power surges as a result of the storm" and that "2 out of 6 motor leads [were] showing 28 m-ohms which is out of tolerance indicating insulation breakdown of motor windings" since "[n]ormal megger readings on electric motors" for chillers such as LaBelle's  is 80 megohms or higher according to Trane specifications.  *See*, Ameritech Proposal No. 9115 dated October 21, 2005, Exhibit L to HSB's motion.

Based upon the October 19, 2005 recommendation of Barrios, HSB retained John Bevington ("Bevington") of ChillCo., Inc. ("Chillco") and had him conduct a follow-up inspection of the chiller on October 21, 2005.  During his inspection, Bevington met with Ameritech and LaBelle's representatives, reviewed the chiller log or alarm history, and megged the chiller motor.  *See*, Bevington deposition transcript, Exhibit F to HSB's motion, p. 18-20, 25-28, 48-50, 64-65, 78-79, and 85.  He recorded the following meg readings: T1: 179; T2: 200; T3: 85; T4: 175; T5: 200; T6: 87.  *Id.*; Chillco Service record dated October 21, 2005 and Invoice dated December 1, 2005, Exhibit U to HSB's motion. Bevington concluded that the "motor megged good and it should run fine."  *Id.*

On October 26, 2005, HSB advised LaBelle that Chillco had found no evidence of

---

[2] Specifically, Wessing's meg readings were as follows: T1: 50.1; T2: 52.2; T3: 22.6; T4: 49.3; T5: 46.6; T6: 28.3.  *See*, Trane Service Work Order for October 20, 2005, Exhibit M to HSB's motion; Deposition of Wessing, p. 6-8.

the conditions reported by Ameritech, and on November 7, 2005, it issued a letter to LaBelle's representatives discussing the results of the investigation, explaining its decision to deny coverage under the relevant policy terms, and reserving all of its rights and defenses under the policy. *See*, Exhibits V and X to HSB's motion. Despite HSB's notice that it was denying coverage, LaBelle proceeded with replacement of the chiller in question in December 2005. At that point, Ameritech megged the chiller motor in question and reported readings of "50 to 70 meg to ground." Ameritech also shipped the chiller to the Trane facility for further testing, inspection, and repairs. *See*, Exhibits O and P to HSB's motion.

On or about August 29, 2006, LaBelle commenced this suit, and HSB subsequently removed the matter to this Court. During discovery, HSB issued a subpoena to Trane seeking production of records concerning its testing, inspection, and repair of the chiller at issue. In response, Trane produced several internal e-mails which confirm that, upon further inspection, the chiller in question was found to have "ohmed good" and "did not burn up or have a bearing failure or anything like that." *See*, Response to HSB Subpoena dated November 6, 2007 by Trane, Exhibit Y to HSB's motion, Emails by Trane employees dated March 31, 2006. Additionally, a Trane employee, Mark Williams ("Williams"), testified in his deposition that, based upon those emails, it could be concluded that there was no electrical or mechanical failure in the chiller motor in question. *See*, Deposition of Williams, p. 24-27, Exhibit I.

Bevington of Chillco has also provided opinions as an expert for HSB indicating that the low meg readings for the chiller in question, which were detected by Ameritech and

4

Trane, do not signify that there was any damage to the motor as a result of Hurricane Katrina, as there is no evidence that the chiller suffered incidents of power fluctuations, power surge, single phase condition, voltage or amperage imbalance.  He further opined that the chiller motor could have been re-started and operated, despite the low meg readings, and that Trane's subsequent inspection and baking of the motor confirms that there was no breakdown or failure of the motor.  *See*, Bevington deposition, p. 24-29; 36-37; 45-51, 57, 59-61, 64-65, 68-69, 81-85.

HSB has now filed a motion for summary judgment, seeking dismissal of LaBelle's claim on the ground that LaBelle will be unable to carry its burden of proving that the claim falls within the terms of the equipment breakdown policy at issue.  Specifically, HSB contends that LaBelle will be unable to produce evidence satisfying the following two threshold requirements for coverage under the policy:  (1) that a "fortuitous event" caused direct, physical damage to the covered equipment (the "accident" requirement); and (2) that the replacement costs for which LaBelle seeks coverage were the "direct result" of and "solely attributable" to an "accident" (the "direct result" of and "solely attributable" to requirement).

## **LAW & ANALYSIS**

### I.    **LaBelle's Failure to File an Opposition:**

Local Rule 7.5M of the Middle District of Louisiana requires that memoranda in opposition to a motion be filed within twenty (20) days after service of the motion.  The rule specifically provides:

> LR7.5M        Response and Memorandum
>
> Each respondent opposing a motion shall file a response,

5

including opposing affidavits, memorandum, and such supporting documents as are then available, within 20 days after service of the motion. Memoranda shall contain a concise statement of the reasons in opposition to the motion, and a citation of authorities upon which the respondent relies. For good cause appearing therefor, a respondent may be required to file a response and supporting documents, including memoranda, within such shorter or longer period of time as the court may order, upon written ex parte motion served on all parties.

The present motion for summary judgment was filed on January 7, 2008, and the Court's electronic filing system indicates that LaBelle's counsel received notice of the filing of that motion on that same date at 2:22 p.m. CDT. Thus, more than twenty days have elapsed since LaBelle was served with HSB's motion, through its counsel, and LaBelle has nevertheless failed to file any opposition. The motion is therefore deemed unopposed. In addition to the motion being unopposed, the Court finds that the motion has merit and should be granted.

## II.   Summary Judgment Standard:

Summary judgment is appropriate where the pleadings, discovery products, and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. Rule Civ. Proc. 56(c). A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[3] Only if the

---

[3] In reviewing a motion for summary judgment, a court " . . .must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh evidence." *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

nonmoving party sets forth specific facts and evidence supporting the allegations essential to his/her claim will a genuine issue of material fact be found to exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[4]

### III.    Can LaBelle establish coverage under the HSB policy for the claim at issue?

Under Louisiana law, the insured bears the burden of proving that an incident giving rise to a claim falls within a policy's terms. *Coleman v. School Bd. of Richland Parish*, 418 F.3d 511 (5th Cir. 2005). The type of insurance coverage afforded by the HSB policy in question is known as "equipment breakdown" coverage. The insurance applies only where an insured, such as LaBelle, can demonstrate that the loss or damage for which it seeks payment was a "direct result" of and "solely attributable to" a specifically covered cause of loss or "accident" as defined by the policy.

The term "accident" is defined in the policy as a "fortuitous event that causes direct physical damage to 'covered equipment'." *See*, HSB Policy, Exhibit E to HSB's motion, p. HSB0015 (Equipment Breakdown Coverage Form, Paragraph A, "Coverage," Sub-paragraph 1, "Covered Clause of Loss - 'Accident'").[5] Furthermore, the "fortuitous event" must be one of the following specifically defined events listed in the policy: (1) mechanical

---

[4]The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law. *Id.*

[5] In *Central Louisiana Electric Co, Inc. v. Westinghouse Electric Corp.*, 579 So.2d 981 (La. 1991), the Louisiana Supreme Court found a similar definition of "accident" in a boiler and machinery policy was clear and unambiguous. *Id.*, at 985.

breakdown, including rupture or bursting caused by centrifugal force; (2) artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires; (3) explosion, other than combustion explosion, of steam boilers, steam piping, steam engines or steam turbines; (4) an event inside steam boilers, steam pipes, steam engines or steam turbines that damages such equipment; (5) an event inside hot water boilers or other water heating equipment that damages such equipment; or (6) bursting, cracking, or splitting.  *Id.*  The policy also provides that an "accident" does not include "any gradually developing condition" or "[m]isalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance."  *Id.*, p. HSB0028.  Additionally, the policy provides that it is the responsibility of the insured to appropriately maintain its property and equipment and that HSB will not cover costs to "maintain, operate, protect, or enhance" the insured's property or equipment, even if such costs are to comply with HSB's recommendations or to prevent loss, damage or expense that would be covered under the policy.  *Id.*, p. HSB0027 (Section F, "Additional Conditions," Sub-paragraph 8, "Maintaining Your Property and Equipment").

As discussed above, the only accident that LaBelle alleges caused damage to its air conditioning system was "power surges" brought about by Hurricane Katrina.  *See*, LaBelle's Petition, Paragraph 6; LaBelle's Answer to HSB's Interrogatory No. 6 ("The A/C units were damaged as a result of damage sustained from power surges as recorded by the unit computer. All damage occurred on August 28, 2005").  However, with its present motion, HSB presents evidence indicating that the chiller log or alarm history for the chiller unit at issue (which records all discrepancies, malfunctions, surges, shutdowns, or other

8

conditions the chiller experiences)[6] reflects that the chiller only suffered a "low refrigerant temperature" alarm on August 27, 2005 (which was considered by inspectors to be irrelevant to the chiller's low mega ohm reading) and "momentary power loss" on four or five occasions on the date in question, August 28, 2005.  *See*, Deposition transcript of Pequeno, p. 47-48; Deposition transcript of Bevington, p. 25.  The evidence presented by HSB further indicates that, if a power surge had occurred, as LaBelle contends, the log or alarm history would have recorded that surge as a power fault and would have specifically represented what it was, whether it was an over-voltage, under-voltage, or a single phase condition – none of which were recorded on or about the date in question.  *See*, Deposition transcript of Bevington, p. 35-37;[7] Deposition transcript of Pequeno, p. 47-48.

LaBelle has not presented any competent evidence refuting the evidence presented by HSB and demonstrating that a power surge actually occurred on or about August 28, 2005.  Instead, its power surge theory is based solely upon its own speculative assertions and the unsupported opinions of Ameritech personnel, who did not perform any tests (other than meg testing, which does not definitively indicate the cause for low meg readings) to determine whether the chiller incurred any power surges.  Accordingly, LaBelle has failed

---

[6] *See*, Deposition transcript of Pequeno, p. 15-16; 45-46.

[7] As noted above, Bevington was called out on October 21, 2005 to "meg" the motor unit at issue and to determine whether there was a "single phase condition" that damaged the motor and caused it to fail, and he determined that such an event did not occur.  *Id.*, p. 64-65.  He concluded that the windings had not burned because he megged the windings, and none of them "megged to zero," which would occur if there was a single phase burn.  Since the motor "megged fine," Bevington found the motor was in "good condition."  *Id.*, p. 65; 78.  Bevington also indicated that he does not know whether a power surge occurred in this case because there was no voltage imbalance reading on the chiller log suggesting that one occurred.  *Id.*, p. 36-37.

to demonstrate that one of the specifically defined occurrences constituting a "fortuitous event" for purposes of the policy in question happened in this case and has therefore failed to prove that an "accident" occurred.

Additionally, even assuming a power surge occurred, thereby satisfying the "fortuitous event" portion of the "accident" component under the policy, LaBelle has failed to present any evidence that the chiller motor actually suffered any "direct physical damage" as a result of such surge requiring replacement of the chiller motor rather than simply repair/maintenance, which is also required for the "accident" component of the policy to be fulfilled.  In this respect, the only evidence plaintiff has concerning physical damage brought about by the alleged power surge is the low meg ohm readings taken by two of the companies that investigated the chiller unit following Hurricane Katrina, Ameritech and Trane.[8]  However, HSB has presented the deposition testimony of Bevington and that of a service technician for Trane, Wessing, indicating that a chiller motor which has "megged low," but has not megged to "zero or to ground," has not yet failed or burned out and can be re-started and operated, despite the low meg readings.[9]  In fact, both Bevington and

_____

[8] As discussed above, according to Ameritech's report concerning its inspection of the unit, normal meg readings on an electric motor like that at issue are 80 m-ohms or higher according to Trane specifications, and upon inspection on October 10, 2005, two out of six of the motor leads in question were showing 28 m-ohms, which was out of tolerance, indicating insulation breakdown of motor windings.  *See*, Exhibits K and L to HSB's motion.

Similarly, Trane's Service Work Order and Proforma Document concerning its evaluation of the chiller compressor in question on October 20, 2005 reflects the meg readings were below specification, with two of the six motor leads showing readings of 22.6 and 28.3 m-ohms.  *See*, Exhibit M to HSB's motion.

[9] Bevington indicated that the claimed low meg readings are not the reason the motor would not start after the hurricane; it was because the cooling tower pipe had

Williams (the Service Solutions Manager at Trane) testified that a chiller motor can operate safely at as low as two mega ohms, and there is no evidence in this case whatsoever that the mega ohms for the chiller in question ever read below twenty.[10]  *See*, Deposition of Bevington, p. 27-31; 37-38; 45-46; 51; 60; 85; Deposition of Williams, p. 38-39 and 45-50; June 15, 2006 letter from Williams of Trane to Pequeno at Ameritech, Exhibit H to HSB's motion.

Finally, Pequeno of Ameritech explicitly testified that the reason the chiller in question was replaced by LaBelle was for "preventive maintenance," *i.e.*, to prevent the failure of the chiller in the future, and that the motor would have run if "you would have jumped out [or bypassed] some of the safeties."[11]  *See*, Transcript of Pequeno, Exhibit N,

_____

been damaged during the storm and did not have water in it.  *See*, Deposition of Bevington, p. 60-61.  He expressly stated that there was no indication the chiller had failed, and he could have started the motor back up with no damage to the chiller, had there been water in the cooling tower pipe.  *Id.*, p. 85.

[10] Bevington testified that, while the range stated in Trane's specifications of 200 to 300 megohms is the range Trane "would like to see with a motor . . . it is quite normal to see megohms readings well below that."  *Id.*, p. 31.  He also indicated that, while a 200 to 300 meg range is appropriate for a new motor, it is very common to have meg readings less than that for subsequent readings when a machine has had time in the field.  *Id.*, p. 34; 59; 64; 78.  He further testified that, even if you have a megohm reading of five, you could turn the unit on and run it for two or three hours, then turn it off, and re-meg the windings.  In doing so, the meg reading would probably be increased due to the heat of the windings cooking off any moisture that would have been on the windings.  *Id.*, p. 45-46.  Finally, Bevington indicated that he could not explain the "drastic" differences in the meg readings by Ameritech and Trane on October 10, 2005 and October 20, 2005 and his readings on October 21, 2005; however, he considered the readings that he took on October 21, 2005 to be "very normal" for a hermetic screw machine chiller motor of that age.  *Id.*, p. 48-49; 60.

[11] Pequeno admitted that the problem with the motor was that Ameritech was getting bad meg ohm readings, not that the motor was grounded or open.  According to Pequeno, the insulation on the motor was "starting to break down;" and when the motor was ultimately rebaked and dipped by Trane, the varnish melted, and the motor went

p. 42, 54-56; *See also*, Pequeno's report, Exhibit O (stating that the combined information from the diagnostic checks showing power failure during the storm and low mega-ohm readings between all six terminals to the ground confirmed that the motor was "in the process of failing," and LaBelle made a decision to proceed with replacement of the compressor at that time rather than during the off season because the repair cost was going to be at least 75% of the replacement cost and delaying repair work carried an additional risk in cost (30 to 100%) and reliability). Accordingly, the evidence produced in this case indicates that LaBelle replaced the chiller in question, not because the motor actually failed or burned out due to power surges resulting from Hurricane Katrina, but instead as "preventive maintenance" because the chiller might fail or burn out at some point in the future if not repaired,[12] and such a proactive maintenance decision does not

_____

back to the way it was before. *See*, Deposition of Pequeno, p. 56-57. This implies that, if LaBelle had simply sent the motor for inspection and repairs/maintenance (rebaking and dipping) by Trane, it could have kept its existing motor instead of purchasing a new one.

[12] LaBelle's own petition states, in Paragraph 6, that the low mega ohm readings brought about by the alleged power surges "beg[an] the shorting out process to ground." It further states that, "when mega ohms tend to reach 50 or below, the greater the chance of complete motor failure." Thus, LaBelle's own allegations suggest that the power surges in question did not actually cause the chiller to fail but instead brought about a "greater chance" of motor failure. *See*, Petition, Paragraph 6. LaBelle's replacement of the chiller motor, based upon the chance that the motor would fail in the future, is not covered by the policy in question, which requires an actual mechanical breakdown or physical damage that cannot be corrected by resetting, restarting, or the performance of maintenance and which is not a "gradually developing condition."

*See also*, June 15, 2006 letter from Williams of Trane to Pequeno of Ameritech, Exhibit H, stating that lower meg ohm readings "shorten the life of the motor/compressor system" and noting that it is 30 to 100% more expensive to replace a motor when there is a catastrophic type failure resulting from motor burnout than with repair type replacements to the motor. Williams specifically stated in the letter that, "[i]t [was Trane's] understanding that [Ameritech] *proactively ordered* a replacement

constitute an "accident" for purposes of equipment breakdown coverage under the policy in question, even if the decision was made to prevent future loss, damage, or expense covered under the policy.[13]  Thus, because LaBelle has failed to come forward with proof demonstrating a genuine issue of material fact as to whether an "accident" occurred, HSB's motion should be granted and LaBelle's claim for coverage under the policy dismissed.[14]

---

motor/compressor driveline, removed the old driveline and reinstalled *to ensure reliability* of the LaBelle Maison apartment complex." *Id.* [Emphasis added].  The letter further provides that the October 20, 2005 ohm readings, following Hurricane Katrina, indicated that "additional *repair work* should be considered;" however, as of that date, the motor "most likely" would have run and the chiller started.  *Id.* [Emphasis added]. Finally, the letter indicates that the low meg ohm readings and the significant drop post hurricane, running well below manufactured guidelines, made the machine "*more vulnerable* to catastrophic type failure (with an internal burnout), *i.e.*, "when the meg readings begin to fall, the compressor has *begun the process of failing*." *Id.* [Emphasis added].  While this evidence suggests that the chiller motor in question may have begun the process of failing, based upon the lower meg ohm readings post hurricane, it also indicates that the motor had not yet completely failed and that it was a proactive decision by LaBelle to replace the motor prior to complete mechanical failure, rather than simply opting to repair the existing motor, which would have been its responsibility and uncovered by the policy in question.

[13] As noted above, HSB is not liable under the policy for the costs incurred by the insured to maintain, operate, protect, or enhance the insured's equipment, even if such costs are to prevent future loss, damage or expense that would be covered under the policy.

[14] Because HSB's arguments concerning the "accident" requirement under the policy have merit, the Court need not address HSB's additional arguments regarding the other requirement for coverage under the policy, the "direct result" of or "solely attributable" to requirement.

## <u>RECOMMENDATION</u>

For the above reasons, it is recommended that the Motion for Summary Judgment (R. Doc. 31) filed by defendant, The Hartford Steam Boiler Inspection & Insurance Company, be **GRANTED** and the claims of plaintiff, LaBelle Maison Associates, be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, January 31, 2008.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

14